IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

RUTH PARKER,

               Plaintiff,

    v.

DELOITTE CONSULTING LLP,

               Defendant.

CIVIL ACTION
NO. 21-2828

## OPINION

**Slomsky, J.**                                         **January 30, 2024**

### Table of Contents

I.    **INTRODUCTION** ........................................................................................... 1

II.    **FACTUAL BACKGROUND** ........................................................................ 1

III.    **STANDARD OF REVIEW** ......................................................................... 6

IV.    **ANALYSIS** ................................................................................................... 7

  A.  **Summary Judgment Will be Granted on Plaintiff's Age Discrimination Claim Under the ADEA** ................................................................................ 8

    1.  Plaintiff has Established a Prima Facie Case of Age Discrimination ............................. 9

    2.  Defendant Satisfies the Second Step of the McDonnell Douglas Framework by Alleging a Legitimate Non-Discriminatory Reason for Plaintiff's Termination ...... 10

    3.  Plaintiff Cannot Show that Defendant's Proffered Reason was Pretext for Age Discrimination .............................................................................................. 12

  B.  **Summary Judgment Will Be Denied on Plaintiff's Disability Discrimination Claim Under the ADA** ........................................................................... 15

**C.  A Genuine Dispute of Material Fact Exists as to Whether Plaintiff Engaged in a Protected Activity to Establish a Prima Facie Claim for Retaliation Under the ADA and PHRA** ................................................................................................... 19

**V.  CONCLUSION** .................................................................................................... 20

## I.   INTRODUCTION

On June 25, 2021, Plaintiff Ruth Parker filed this action against Defendant Deloitte Consulting LLP ("Deloitte") seeking damages based on violations of: 1) the Age Discrimination in Employment Act, 29 U.S.C. § 623, et seq. ("ADEA") (Count I); 2) the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq. ("ADA") (Count II); and 3) the Pennsylvania Human Relations Act, 43 P.S. § 951, et seq. ("PHRA") (Count III).  (Doc. No. 1.)  Plaintiff alleges that during her employment at Deloitte, she was discriminated against and harassed because of her age and disability.  She also alleges she was retaliated against for complaining about the discrimination and harassment and for seeking accommodations for her disability.

On June 13, 2023, Defendant filed a Motion for Summary Judgment.  (Doc. No. 41.)  On July 7, 2023, Plaintiff filed a Response in Opposition (Doc. No. 43), and on July 14, 2023, Defendant filed a Reply (Doc. No. 46).  The Motion for Summary Judgement (Doc. No. 41) is now ripe for disposition and for reasons that follow, the Motion (Doc. No. 41) will be granted in part and denied in part.

## II.   FACTUAL BACKGROUND

Plaintiff is a former consultant in Defendant Deloitte's "Encore Program" at its Philadelphia, Pennsylvania location.  (Doc. No. 1 at 3.)  Prior to joining the Encore Program, Plaintiff worked as a consultant at PricewaterhouseCooper ("PWC") and Ernst & Young but had taken several years off to handle family matters.  (Doc. No. 42-5 at 2.)  She also had taught undergraduate and graduate level business courses at several universities.  (Id.)

Deloitte's Encore Program is a fourteen-week paid internship program in which participants are onboarded and trained in the same manner as regular consultants with the goal of rolling them directly into a full-time position as a consultant.  (Doc. No. 1 at 4.)  While the goal of

the intern is to receive an employment offer at the end of the internship, participants understand that receiving an offer is contingent on their performance throughout the fourteen weeks.[1]  (Doc. No. 42-1 at 4.)  The Encore Program is specifically designed for workers, like Plaintiff, who had been out of the workforce for over two years.[2]  (Doc. No. 1 at 4.)  The Encore Program includes orientation, mentoring through an onboarding advisor, working with a deployment specialist to be assigned to client projects, and training at Deloitte University.  (Id.)

On July 14, 2019, Plaintiff began the Encore Program.  (Id.)  At that time, Plaintiff was sixty-seven years old and had a hearing impairment.[3]  Her job title was "Consultant" and she worked in Deloitte's Enterprise Operations group based in Philadelphia, Pennsylvania.  (Id.)  In July 2019, in preparation for Plaintiff to travel to attend "Deloitte University" for Encore training, she requested a hearing-impaired room[4] and a closed caption phone.  (Id. at 6.)  Her request for a hearing-impaired room was approved but her request for a closed captioned phone was denied. (Id. at 7.)  During her training at Deloitte University, Plaintiff had difficulty hearing presenters and informed Anjali Sinha, the Senior Manager leading the presentation, of her impairment.  (Id.)

---

[1] Plaintiff's offer letter to join the Encore Program states that Defendant was extending Plaintiff an "offer of temporary employment."  (Id.)

[2] At her deposition, Plaintiff testified that she applied to the Encore Program because she has a background in management consulting and because she has been out of the management consulting arena for two years.  (Parker Dep., Ex. C, at 14:13-21.)

[3] Under the ADA, a hearing impairment is classified as a disability.

[4] This request is a point of factual dispute.  Defendant submits that Plaintiff's hotel room was "equipped with a vibrating alarm under the pillow and flashing doorbell lights in the event of fire." (Doc No. 42-1 at 6.)  Plaintiff counters that these accommodations were not sufficient.  (Doc. No. 43-3 at 24.)  She alleges that "the hotel room lacked anything that would allow a hearing-impaired person to communicate with others" and she complained on multiple occasions "that the hotel room did not have the type of telephone or other devices that would help her to communicate, but her complaints went unresolved."  (Id.)

2

Sinha told Plaintiff to "sit closer to the front," which Plaintiff alleges isolated her and singled her out. (Id.)

Following the training, Plaintiff made a request on August 1, 2019 for closed caption support when using Skype for Business, a video-conferencing platform. (Id.) On August 2, 2019, Robert T. Anderson, a Telecommunications Specialist at Deloitte, responded to Plaintiff's request stating that there were no translation, transcript, or script options used at Deloitte. (Id.) That same day, Plaintiff requested a Skype Translator be added, a tool that translates live speech to text for screen display. (Id. at 8.) Anderson sent her an email stating he needed more time to assess this request because he was sending the request to the engineering manager. (Id.; see also Doc. No. 42-13 at 2-3.)[5] On August 6, 2019, Anderson emailed Plaintiff with headset recommendations, none of which could be used with her hearing aids. (Doc. No. 1 at 7.)

Plaintiff alleges that Defendant's failure to provide her with accommodations resulted in her being unable to meaningfully participate in office conference calls, on-site meetings or training videos, use telephone equipment on site to communicate with colleagues or project staffers, use the company issued laptop for audio portions of collaborations, use Deloitte telephones or communications equipment, or understand audio portions of team meetings, hands calls, presentations, or anything that used a slide capability with audio narrative. (Id.) For example, on August 9, 2019, Plaintiff was unable to participate in a call at the office and had to do so from home using her own closed captioned phone. (Id.)

From August 19 to September 20, 2019, Plaintiff was assigned to a project based in Greenwood, Colorado (the "Colorado Project"). (Id. at 9.) Plaintiff was assigned to a three-person

---

[5] Anderson also reached out to Microsoft Corporation, who informed him that Skype translation services were not supported in Skype for Business. (Doc. No. 42-1 at 7.)

team, which included Senior Consultant and Team Leader A.J. Dulik and Senior Consultant Alexander Schmitt.  (Id.)  On the first day of the project, Plaintiff had a meeting with Dulik and Schmitt and had difficulty hearing them.  (Id.)  Plaintiff asked that they face her when they spoke so she would have an easier time hearing them.  (Id.)  Both Dulik and Schmitt ignored the request and proceeded to isolate Plaintiff from the discussions.  (Id.)  Schmitt also mouthed to Dulik, "why are you even here?" in reference to Plaintiff.  (Id.)

The next morning, Plaintiff was removed from the group office, placed in a cube away from the working group, and excluded from all client interactions and meetings except two during the five-week period of the project.  (Id. at 10.)  Dulik and Schmitt also intentionally lowered their voices when speaking with Plaintiff and walked up behind her in a manner that would startle her.  (Id.)  On one occasion, Schmitt told Plaintiff, "you're as old as my mother."  (Id.)  Plaintiff claims that other Deloitte employees mirrored the discriminatory actions of their superiors.  (Id.)  In one instance, Mattie Wheaton, a Business Analyst, remarked "[a]ren't you too old to be an Intern?" (Id.)  On September 6, 9 and 25 of 2019, Plaintiff complained to Mark Keragelian, her onboarding advisor and Shruthi Chakravathy, her coach, about the discrimination and harassment to which she was being subjected.  (Id. at 11.)  Neither individual took any corrective action.  (Id.)

On August 25, 2019, Kort Syverson, a partner at Deloitte, wrote an email to Rochelle Bowen[6] regarding his concerns about Plaintiff.  (Doc. No. 43-3 at 12.)  He stated that during a meeting, Plaintiff "appears to have a hearing issue," as she took very few notes, "likely because she can't hear the speaker."  (Id.)  In response to Syverson's email, Bowen acknowledged that as

---

[6]   Rochelle Bowen was a talent business adviser for Deloitte.  (Doc. No. 43-3 at 12.)

a whole, Plaintiff's perceived hearing issues were a "delicate situation that could expose us to risk so we need to tread lightly (especially if she's trending to 'no offer' status.)"  (Id. at 13.)

Plaintiff also faced additional challenges during the Colorado project.  On September 3, 2019, Dulik wrote to Plaintiff telling her that she was billing her time incorrectly.  (Doc. No. 42-1 at 12.)  On September 4, 2019, Dulik also noted concerns with her performance such as "having trouble with travel to and from airport/hotel…logging hours…unable to provide client ready slides in PowerPoint" and that she missed an important phone call.  (Id. at 12-13.)

On September 14, 2019, Plaintiff went to an Emergency Room after a fall and was diagnosed with a partially torn Posterior Cruciate Ligament ("PCL") and blood clots in her leg. (Doc. No. 1 at 11.)  Plaintiff was strongly advised not to travel by air and was warned about the possibility of a fatal embolism from the blood clots.  (Id.)  Plaintiff communicated this information to Dulik, who insisted that Plaintiff be in Denver the following Monday, September 16, 2019.  (Id.)

At the end of the Encore Program, three Deloitte employees evaluated whether to hire Plaintiff for a fulltime position.[7]  (Doc. No. 42-1 at 14.)  They sought feedback from team members who worked for 20 hours or more on the same projects as Plaintiff.  (Id.)  Using this feedback, they interviewed six individuals.[8]  (Id. at 15.)  Each provided negative comments about Plaintiff and stated that they did not think she should be hired for a full-time position.  (Id.)  For example, Doug Plotkin, a Deloitte partner, stated that Plaintiff "had no contribution" on the Colorado project and that she "did not put in the effort."  (Id.)  Carlos Amerol, a Deloitte employee, stated Plaintiff was "not flexible," her "[n]otes [were] not good," the "[c]lient recognized no value in [] meeting"

---

[7]  These employees were three Deloitte leaders: Kort Syverson, Timothy Gross and Annamaria Cherubin.  (Doc. No. 42-1 at 14.)

[8]  These individuals were Doug Plotkin, Carlos Amerol, A.J. Dulik, Sudeep Khare, and Kort Syverson.  (Id. at 15.)

her, she "did not join evening USI calls (even after feedback)" and he would "[g]rade her lowest." (Id.)

Defendant also used a scatterplot to compare the performance of the five Encore Program participants. (Doc. No. 43-1 at 14.) A participant's scatterplot score can range from 2 to 10 and is compared to the other members of the program. (Id.) Plaintiff had the lowest scatterplot score of 4. (Id.)

At the end of Plaintiff's 14-week internship in Deloitte's Encore Program, she was not hired by Deloitte. (Doc. No. 42 at 16.) Of the five individuals who began the Encore Program at the same time as Plaintiff, only one was offered a permanent position. (Id.) The individual that received an offer was 56 years old. (Id.)

## III.    STANDARD OF REVIEW

Granting summary judgment is an extraordinary remedy. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In reaching this decision, the court must determine whether "the pleadings, depositions, answers to interrogatories, admissions, and affidavits show there is no genuine [dispute] of material fact and that the moving party is entitled to judgment as a matter of law." Favata v. Seidel, 511 F. App'x 155, 158 (3d Cir. 2013) (quoting Azur v. Chase Bank, USA, Nat'l Ass'n, 601 F.3d 212, 216 (3d Cir. 2010)). A disputed issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party. Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). For a fact to be considered "material," it "must have the potential to alter the outcome of the case." Favata, 511 F. App'x at 158. Once the proponent of summary judgment "points to evidence demonstrating no

[dispute] of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine [disputes] of material fact exists and that a reasonable factfinder could rule in its favor." Id. (quoting Azur, 601 F.3d at 216).

In deciding a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. (alteration in original) (quoting Chambers ex rel. Chambers v. Sch. Dist. of Philadelphia Bd. of Educ., 587 F.3d 176, 181 (3d Cir. 2009)). The Court's task is not to resolve disputed issues of fact, but to determine whether there exist any factual disputes to be tried. Anderson, 477 U.S. at 247–249. Whenever a factual dispute arises which cannot be resolved without a credibility determination, at this stage the Court must credit the nonmoving party's evidence over that presented by the moving party. Id. at 255. If there is no factual dispute, and if only one reasonable conclusion could arise from the record regarding the potential outcome under the governing law, summary judgment must be awarded in favor of the moving party. Id. at 250.

## IV.   ANALYSIS

In her Complaint, Plaintiff alleges that Defendant (1) discriminated against her on the basis of her age, (2) discriminated against her on the basis of her disability, (3) failed to accommodate her disability, and (4) retaliated against her in violation of the ADEA, ADA and PHRA. (See Doc. No. 1.) Defendant moves for summary judgment on all four claims. (See Doc. No. 42.) The Court will evaluate these arguments in seriatim.

**A. Summary Judgment Will be Granted on Plaintiff's Age Discrimination Claim Under the ADEA**

First, Plaintiff alleges that Defendant discriminated against her on the basis of her age. Claims of age discrimination under the ADEA[9] are examined under the burden-shifting analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).[10]  Under this analysis, a plaintiff "must carry the initial burden under the statute of establishing a prima facie case of ... discrimination."  Id. at 802.  If a prima facie case has been established, "[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection."  Id.  If the employer is able to provide such a reason, the burden shifts back to the plaintiff to produce "sufficient evidence to raise a genuine issue of fact as to whether the employer's proffered reasons were not its true reasons for the challenged employment action."  Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1067 (3d Cir. 1996).  "At all times, however, the burden of persuasion rests with the plaintiff."  Smith v. City of Allentown, 589 F.3d 684, 689–90 (3d Cir. 2009).  Turning to the first step of the framework, Plaintiff has established a prima facie case of age discrimination.

---

[9]  The ADEA provides in pertinent part:

> It shall be unlawful for an employer—(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's age.

29 U.S.C. § 623(a).

[10]  There is no direct evidence of discrimination in this case.  Therefore, the burden-shifting analysis set forth in McDonnell Douglas applies.  See Fasold v. Justice, 409 F.3d 178, 184 (3d Cir. 2005) (holding that a plaintiff may establish employment discrimination by either "(1) presenting direct evidence of discrimination or (2) by presenting indirect evidence of discrimination that satisfies the familiar three-step framework of McDonnell Douglas." ) (internal citations omitted.)

### 1. Plaintiff has Established a Prima Facie Case of Age Discrimination

A prima facie case of age discrimination is made by:

> showing first, that the plaintiff is forty years of age or older; second, that the defendant took an adverse employment action against the plaintiff; third, that the plaintiff was qualified for the position in question; and fourth, that the plaintiff was ultimately replaced by another employee who was sufficiently younger to support an inference of discriminatory animus.

Smith, 589 F.3d at 689–90 (citing Potence v. Hazleton Area Sch. Dist., 357 F.3d 366, 370 (3d Cir. 2004)).

Here, Defendant only disputes the third element of establishing a prima facie case of age discrimination.  It argues that Plaintiff cannot show she was qualified to be a consultant because she could not perform the essential functions of her role.  While this argument will be properly addressed in the ADA claims section, infra, the Third Circuit Court of Appeals has held that at the first stage of the McDonnell Douglas analysis for an ADEA claim, it is "[o]bjective job qualifications" that "should be considered in evaluating plaintiff's prima facie case."  "In other words, Plaintiff at this stage is not required to prove that he performed his job well; Plaintiff is unqualified for this purpose only if he lacked the "absolute minimum requirement of qualification, best characterized in those circumstances that require a license or a similar prerequisite in order to perform the job." Cassidy v. Halyard Health Inc., 391 F.Supp.3d 474, 484 (E.D. Pa 2019) (citing Makky v. Chertoff, 541 F.3d 205, 216 (3d Cir. 2008)).  Subjective determinations like "performance issues that may arise. . . is 'more logically a defense that is raised at the second level' [of the McDonnell Douglas framework]," rather than evidence of the plaintiff being unqualified in the first place." Lassiter v. Children's Hospital of Phil., 131 F.Supp.3d 331, 342 (E.D. Pa. 2015) (citing Sempier v. Johnson & Higgins, 45 F.3d 724 (3d Cir. 1995)).

Here, Plaintiff possessed the objective qualifications to satisfy this standard.  Plaintiff previously worked as a consultant at PWC and Ernst & Young.  She also taught business classes at the undergraduate and graduate level.  Notably, Defendant considered Plaintiff qualified to be a consultant when they hired her for the Encore Program.  While Defendant now counters that her job performance demonstrates that she was not qualified, that evidence must be evaluated in the second step of the McDonnell Douglas analysis, not the first.  As such, Plaintiff has satisfied her burden of demonstrating a prima facie case of age discrimination under the ADEA.  Therefore, the Court focuses on the next stage of the analysis: whether Defendant's reason for not hiring her is legitimate or pretextual.

       2.   Defendant Satisfies the Second Step of the McDonnell Douglas Framework by Alleging a Legitimate Non-Discriminatory Reason for Plaintiff's Termination

Defendant submits that Plaintiff was not offered a fulltime position because of her subpar job performance.  Defendant bears the initial burden of showing the absence of a genuine issue of fact as to whether this proffered reason is legitimate and non-discriminatory.  Mendoza v. Gribetz Intern., Inc., No. 10–1904, 2011 WL 2117610, at *2 (E.D. Pa. May 27, 2011) (citing Celotex Corp. v. Catrett, 477 U.S. 317 (1986)).  To meet this burden, Defendant has presented evidence that Plaintiff performed poorly on the job, and that Defendant provided Plaintiff guidance on these deficiencies and how to remedy them.  Nonetheless, Defendant submits that it did not hire Plaintiff because her overall productivity was low and none of the six individuals who reviewed Plaintiff as a candidate recommended that she be offered a fulltime position.

There is "only one reasonable conclusion [that] could arise" from a review of Defendant's evidence: Plaintiff was not hired because of her substandard job performance, not because of her age.  Notably, as a member of the fourteen-week Encore Program, Plaintiff recognized that she had the opportunity to demonstrate her performance and receive an offer of employment at the end

10

of the program, but that the offer was not guaranteed.  (Doc. No. 42-1 at 4.)  The evidence establishes that despite acknowledging this incentive, Plaintiff performed poorly in the program.

During the Colorado project, Plaintiff was expected to assist the client by "looking at reengineering aspects of [the client's] outsourcing and financial issues." (Id.)  But during the six-week project, Plaintiff faced many challenges.  For instance, Plaintiff failed to bill her time correctly.  (Id. at 12.)  On September 3, 2019, team leader Dulik wrote to Plaintiff stating: "Ruth, I thought we spoke about logging no more than 45 hours per week." (Id.)  Plaintiff acknowledges this deficiency but argues that she was never told how to properly allocate billable hours between firm projects.  (Doc. No. 43-2 at 31.)  Plaintiff also missed required calls and Dulik had to remind Plaintiff that these calls were mandatory.  (Doc. No. 42-1 at 12.)  Plaintiff acknowledges missing calls but argues that she "only missed evening calls when there was travel involved." (Doc. No. 43-2 at 31.)  Finally, Dulik conveyed to Plaintiff his concerns that she was "unable to provide client ready slides in PowerPoint" and that the client was unhappy with her performance on the project.  (Doc. No. 42-1 at 13.)  Plaintiff acknowledges there was a problem with her PowerPoint presentation but claims that it was "not [a] significant issue[] and clearly [does] not warrant termination." (Doc. No. 43-2 at 32.)  In sum, in a September 3, 2019 "performance snapshot"[11] Dulik noted that:

> Ruth [Parker] has joined our team with energy and excitement, but she did not seem to understand the expectations of being on a Deloitte consulting team. She struggles with providing the most basic support with skills like PowerPoint and Excel. Ruth has required significant support from the team and has struggled in providing value to the engagement. She provides materials that need to be completely reworked and do not fulfill what was asked of her.

---

[11] A snapshot is "an assessment of a consultant's performance on a particular project." (Doc. No. 42-1 at 13.)

(Doc. No. 42-1 at 13-14.)   Despite numerous attempts to help Plaintiff succeed, a second

performance snapshot on September 25, 2019 demonstrated that she was not improving:

> Despite numerous conversation[s] with Ruth, she did not seem to understand the
> Deloitte culture and expectations. Ruth required multiple (3-5) reminders to
> complete Deloitte requirements and project tasks in a proper manner.

(Id. at 14.)

Other individuals also felt that Plaintiff's performance was subpar.   Each of the six Deloitte

employees who provided feedback on Plaintiff's overall performance did not recommend she be

hired after the internship.[12]   Doug Plotkin, a Deloitte partner, stated that Plaintiff "had no

contribution" on the Colorado project and that she "did not put in the effort." (Id. at 15.)   Carlos

Amerol, a Deloitte employee, stated that Plaintiff was "not flexible" her "[n]otes [were] not good,"

that the "[c]lient recognized no value in [] meeting" her, she "did not join evening USI calls (even

after feedback)" and that he would "[g]rade her lowest." (Id.)   Of the five individuals in the

internship program, her performance was ranked the lowest. (Id. at 16.)   When Shruti

Chakravarthy, Plaintiff's "coach" presented this feedback to the three Deloitte hiring decision

makers, they decided not to extend a job offer to Plaintiff. (Id.)   Based on this well-documented

evidence, Defendant's proffered reason for not hiring Plaintiff is legitimate, non-discriminatory

and supported by an overwhelming amount of evidence.

3.   Plaintiff Cannot Show that Defendant's Proffered Reason was Pretext for Age
     Discrimination

In order to survive a motion for summary judgment after a defendant has articulated a

legitimate, non-discriminatory reason for the adverse employment action, a plaintiff must produce

"sufficient evidence to raise a genuine issue of fact as to whether the employer's proffered reasons

---

[12]   These individuals worked 20+ hours with Plaintiff. (Id. at 14.)

were not its true reasons for the challenged employment action." <u>Harding v. CareerBuilder, LLC</u>, 168 Fed. App'x. 535, 538 (3d Cir. 2006) (quoting <u>Sheridan v. E.I. DuPont de Nemours & Co.</u>, 100 F.3d 1061, 1067 (3d Cir. 1996)).  The Third Circuit has articulated three possible ways to make this showing.  <u>See</u> <u>Harding</u>, 168 Fed. App'x. at 538.  A plaintiff can submit evidence "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate his discharge, or (3) that they were insufficient to motivate discharge."  <u>Id.</u>  Here, Plaintiff has not established pretext under any of these theories.

First, Plaintiff admits that she had performance deficiencies during the Colorado project. Therefore, Plaintiff does not argue that Defendant's proffered reason for not hiring her had no basis in fact.  Instead, Plaintiff argues that these mistakes "were not significant issues and clearly do not warrant termination." (Doc. No. 43-2 at 32.)  She also contends that regarding her mistakes, "[w]hen she was later informed of [an] expectation, she followed those instructions" and that she did not receive clear instructions on some of the performance deficiencies.  (<u>Id.</u> at 31-32.)  These contentions do little to undermine Defendant's reasons for not hiring Plaintiff.  Defendant was clear from the onset of the fourteen-week program, a job offer was not guaranteed and that members of the cohort had to prove themselves by their performance.  Notably, only one of the five interns working with Plaintiff received an offer of employment.

Plaintiff's second argument is that statements from Defendant's employees Schmitt and Wheaton indicate that the actual motivation for Plaintiff's discharge was Plaintiff's age.  Plaintiff argues that Alexander Schmitt's comment "you're as old as my mother" and Mattie Wheaton's comment "aren't you too old to be an intern?" support an inference that Deloitte did not offer her a fulltime position before of her age.  Defendant contends that if Schmitt and Wheaton made such

comments, they were "stray remarks," insufficient on their own, to support an inference of age discrimination.  The Court agrees.

In evaluating pretext arguments based on discriminatory comments, courts may consider as circumstantial evidence "the atmosphere in which the company ma[kes] its employment decisions."  Josey v. John R. Hollingsworth Corp., 996 F.2d 632, 641 (3d Cir. 1993). Circumstantial evidence may include "statements of a person involved in the decisionmaking process that reflect a discriminatory or retaliatory animus of the type complained of in the suit ... even if the statements are not made at the same time as the adverse employment decision." Fakete v. Aetna, Inc., 308 F.3d 335, 339 (3d Cir. 2002).   However, "[s]tray remarks by non-decisionmakers . . .  are rarely given great weight, particularly if they were made temporally remote from the date of decision."  Ezold, 983 F.2d at 545 (emphasis added).  Indeed, "discriminatory statements . . . made by non-decision-makers or individuals who played no part in the decision are inadequate to support an inference of discrimination."  Foster v. New Castle Area Sch. Dist., 98 Fed. Appx. 85, 87 (3d Cir. 2004) (holding that there was no inference of discrimination in the hiring of a principal where school board members made discriminatory comments but a lower-level administrator decided alone that plaintiff would not be interviewed for the job).

Here, Alexander Schmitt and Mattie Wheaton were not decisionmakers.  While Plaintiff argues that Defendant's decision not to hire Plaintiff was "based on the feedback" of Schmitt and Wheaton, she has provided no factual evidence to support this claim.  Schmitt and Wheaton were not one of the three individuals that made the final decision not to offer Plaintiff a consulting position, nor were they one of the six employees from whom Plaintiff's coach collected feedback. Accordingly, since these comments, while potentially insensitive, were made by non-decisionmakers, outside of the decision-making context, they do not show pretext.

Finally, Plaintiff argues that another older female Deloitte employee, Maryanne Laouri, complained that the firm did not treat older women well.  (Doc. No. 43-2 at 43.)  However, the only evidence Plaintiff submits to support this claim was deposition testimony by a Deloitte hiring manager discussing that Laouri's claim was investigated.  (See Doc. No. 45-3 at 4.)  There is no evidence that Laouri's claim went past a subjective belief on her part that she was discriminated against and is insufficient to create an inference of pretext.  As such, this argument also fails.

In sum, Plaintiff has failed to produce evidence to raise a genuine issue of fact as to whether Defendant's proffered reasons for not hiring her was mere pretext.  Sheridan, 100 F.3d 1067. Plaintiff was aware that a job offer was contingent on her performance during the fourteen-week Encore Program.  Because there is no genuine dispute of material fact as to why Plaintiff was not offered employment under the pretext prong, Defendant's Motion for Summary Judgment on Plaintiff's claim of age discrimination will be granted.

### B. Summary Judgment Will Be Denied on Plaintiff's Disability Discrimination Claim Under the ADA

Claims of disability discrimination under the ADA[13] also are examined under the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).[14]  Under

---

[13]  The ADA prohibits employers from discriminating:

> [A]gainst a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions and privileges of employment.

42 U.S.C. § 12112(a).

[14]  There is no direct evidence of disability discrimination in this case.  Therefore, the burden-shifting analysis set forth in McDonnell Douglas applies.  See Fasold v. Justice, 409 F.3d 178, 184 (3d Cir. 2005) (holding that a plaintiff may establish employment discrimination by either "(1) presenting

this analysis, a plaintiff "must carry the initial burden under the statute of establishing a prima facie case of ... discrimination." Id. at 802.   To establish a prima facie case under the ADA, a plaintiff must show that she (1) is disabled, (2) otherwise qualified to perform the essential functions of the position, with or without reasonable accommodation, and (3) suffered an adverse employment decision because of the discrimination.   Tice v. Centre Area Transp. Auth., 247 F.3d 506, 512 (3d Cir. 2001).   Under the second prong,[15] the Third Circuit held in Deane v. Pocono Med. Ctr., that the "qualified individual" analysis requires a two-part inquiry:

> First, a court must determine whether the individual satisfies the requisite skill, experience, education and other job-related requirements of the employment position that such individual holds or desires.   Second, it must determine whether the individual, with or without reasonable accommodation, can perform the essential functions of the position held or sought.

142 F.3d 138, 146 (3d Cir. 1998).

Here, the parties do not dispute the first step of the "qualified individual" analysis.[16] Rather, Defendant argues that Plaintiff could not perform the essential function of her consultant role with or without reasonable accommodation.   It submits that the essential function in question is Plaintiff's ability to "effectively communicate" with coworkers and clients on behalf of Deloitte. (Doc. No. 42 at 11.)   Plaintiff disagrees, countering that even if "effective communication" was an essential function of her consulting role, she would have been able to effectively communicate if

---

direct evidence of discrimination or (2) by presenting indirect evidence of discrimination that satisfies the familiar three-step framework of McDonnell Douglas.") (internal citations omitted.)

[15]   The parties do not dispute that Plaintiff is disabled.

[16]   For the purposes of the Motion for Summary Judgment, Defendant does not dispute that Plaintiff possessed the requisite skill, experience and education to be a Deloitte consultant.   As noted previously, she was employed as a consultant at PricewaterhouseCoopers and Ernst & Young and she also taught business classes at undergraduate and graduate levels.

Defendant had reasonably accommodated her disability.  As will be discussed below, there is a genuine dispute of material fact as to whether Plaintiff reasonably accommodated Plaintiff and if those accommodations would have allowed her to effectively communicate.

Defendant argues that for all of Plaintiff's requested accommodations, it either provided those requests to Plaintiff or offered Plaintiff an alternative accommodation that Plaintiff rejected. (Doc No. 42 at 14.)  Plaintiff disputes this claim and states that "Defendant failed and simply outright refused to engage in the interactive process" necessary to find her accommodations for her disability.  (Doc. No. 43-2 at 18-19.)

To demonstrate that a defendant failed to engage in good faith in the interactive process, a plaintiff must show:

> 1) the employer knew about the employee's disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the employer's lack of good faith.

Hohider v. United Parcel Service, Inc., 574 F.3d 169, 187 (3d Cir. 2009).  Here, the parties only dispute the third and fourth elements.

Under these elements, a genuine dispute of material fact exists as to whether Defendant made a good faith effort to assist Plaintiff in seeking accommodations and whether the accommodations were possible.  When attending Deloitte University, Plaintiff requested a hearing-impaired room.  Plaintiff submits that the hotel room provided to her did not allow her to "effectively communicate with the front desk, her family or to attend meetings via telephone." (Doc. No. 43-2 at 20; Doc No. 42-1 at 6.)  Defendant disagrees, stating that it did provide her with a hearing-impaired room which was "equipped with a vibrating alarm under the pillow and

flashing doorbell lights in the event of fire." Thus, a factual dispute exists as to whether Defendant properly accommodated Plaintiff at Deloitte University.

Further, Plaintiff also submits that Defendant failed to engage in an interactive process with her to find a reasonable accommodation regarding her ability to attend meetings. Plaintiff requested closed captioning or transcription services added to Skype, which Deloitte used for meetings. She argues that Defendant improperly denied this request because she emailed Anderson, a Telecommunications Specialist at Deloitte, with directions on how to enable Skype translator. (Doc. No. 43-3 at 5.) She also alleges that Anderson also received instructions from Jaspreet Singh on how an application called "CART" could be added to Skype for business to assist people with hearing disabilities. (Id.) Finally, Plaintiff alleges that after Anderson offered her a headset to use with Skype, she discovered the headset was not hearing aid compatible, and Defendant made no additional attempts to accommodate her as she continuously made requests to do so. (Doc. No. 43-2 at 39.) Defendant disputes this claim, stating that it did engage in a good faith effort to accommodate her. Regarding Skype, it states that Anderson reached out to Microsoft Corporation, "who informed him that the Skype translation services was not supported in Skype for Business." (Doc. No. 42-1 at 7.) It also argues that Anderson investigated whether speech-to-text translation was available for Zoom, an alternative to Skype, but Zoom was still in pilot mode at Deloitte. (Id. at 8.) Finally, it concludes that Anderson's recommended headsets were a reasonable accommodation and that Plaintiff both rejected the headset and failed to make additional accommodation requests. (Id.)

Accordingly, there is a factual dispute as to whether the translation services Defendant requested were possible, whether Defendant offered reasonable alternatives and whether it engaged in a good-faith interactive process. In finding a genuine dispute of material fact in step

one of the <u>McDonnell Douglas</u> framework, the Court will deny summary judgment on Plaintiff's

ADA discrimination claim and the Court need not address the final two steps of the framework.

> ### C. A Genuine Dispute of Material Fact Exists as to Whether Plaintiff Engaged in a Protected Activity to Establish a Prima Facie Claim for Retaliation Under the ADA and PHRA

Finally, Plaintiff alleges a retaliation claim against Defendant under her ADEA, ADA and

PHRA claims.  Because the Court will grant Defendant's Motion for Summary Judgment on the

ADEA claim, the Court will also grant Summary Judgment on her ADEA retaliation claim.  As

such, the Court will only address Plaintiff's ADA and PHRA retaliation claims, which can be

addressed together.[17]

To establish a prima facie case of retaliation, a plaintiff must show that "(1) he engaged in

a protected employee activity;[18] (2) his employer took some adverse action either after or

contemporaneous with that protected activity; and (3) a causal connection existed between the

employee's protected activity and the employer's adverse action."  <u>Cellucci</u>, 987 F.Supp.2d at 593

(citing <u>Fasold v. Justice</u>, 409 F.3d 178, 188 (3d Cir. 2005)).

A causal connection can be demonstrated by providing direct or circumstantial evidence of

(1) unusually suggestive temporal proximity; (2) a pattern of antagonism following the protected

---

[17]   As a threshold matter, in the Third Circuit, ADA and PHRA retaliation claims are discussed together.  <u>See</u> <u>Keyhani v. Trustees of Univ. of Pennsylvania</u>, 812 F. App'x 88, 92 (3d Cir. 2020) ("[W]e analyze ADA retaliation claims under the same framework we employ for retaliation claims arising under Title VII.") (citation omitted); <u>LeBlanc v. Hill Sch.</u>, No. CIV.A. 14-1674, 2015 WL 144135, at *13 (E.D. Pa. Jan. 12, 2015) ("The antiretaliation provisions in the ADEA are "nearly identical" to those in Title VII, and the antiretaliation provisions in the PHRA are "substantially similar" to those in Title VII").

[18]   To establish a prima facie case of retaliation under the ADA, Plaintiff must show that he engaged in protected employee activity.  <u>Krouse</u>, 126 F.3d at 500.   Under the ADA, a request for a reasonable accommodation constitutes protected activity.  <u>Fogleman</u>, 122 F. App'x. 581.  As one example, Plaintiff's request for Skype transcription services satisfies this requirement.

activity; or (3) a showing that the reason for his alleged adverse action is pretextual. <u>Leboon v. Lancaster Jewish Cmty. Ctr. Ass'n</u>, 503 F.3d 217, 232 (3d Cir. 2007); <u>Krouse</u>, 126 F.3d 494.  If the employee establishes a prima facie case for retaliation, the burden then shifts to the employer to advance a legitimate, non-retaliatory reason for its adverse employment action. <u>Woodson v. Scott Paper Co.</u>, 109 F.3d 913, 920 (3d Cir. 1997).

The parties dispute the third prong of the prima facie case, where "a causal connection existed between the employee's protected activity" and Defendant not offering Plaintiff a permanent job position.  As noted above, since the parties disagree as to whether Plaintiff has demonstrated that Defendant's engaged in discrimination by refusing to accommodate her, an issue of material fact exists as to whether there is a casual connection between Plaintiff requesting accommodations and Defendant declining to hire her.  Again, it is not appropriate for the Court to make credibility determinations at this stage of the case on this issue.  Thus, summary judgment will be denied with respect to Plaintiff's retaliation claim under the ADA.

## V.  CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (Doc. No. 41) will be granted only on Plaintiff's ADEA claim and related ADEA retaliation claim.  An appropriate Order follows.